IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

COBRA CAPITAL, LLC, et al., etc., )
                                       )
            Plaintiffs, )
                                       )
  v.                                )     No. 08 C 6884
                                       )
POMP'S SERVICES, INC., et al.,   )
                                     )
            Defendants. )

## MEMORANDUM OPINION AND ORDER

Cobra Capital LLC and Forest Park National Bank & Trust Co. (collectively "Cobra," treated after this sentence as a singular noun) have brought this diversity action against Pomp's Services, Inc. and Frank Pomprowitz (individually "Pomprowitz") (those two defendants are collectively termed "Pomp's," also treated for convenience as a singular noun), suing for breach of contract after Pomp's had defaulted on an Equipment Lease Agreement ("Agreement") with Cobra. Pomp's has not only answered the Complaint but has also counterclaimed against Cobra, alleging violations of the Illinois Uniform Commercial Code ("Code," 810 ILCS 5/1-101 to 5/13-103)[1] plus conversion and fraud.

Pomp's has now moved for partial summary judgment--that is, a summary judgment as to liability--against Cobra under Fed. R.

---

[1] Future references to the Code will take the form "Section --." All references are to the version of the Code in place at the time the Agreement was executed. Former Section 1-201(37), at issue here, has since been renumbered and revised and is now found in nearly identical form at Section 1-203.

Civ. P. ("Rule") 56.[2]  For the reasons stated here, the motion is denied.

**Summary Judgment Standard**

Every Rule 56 movant bears the burden of establishing the absence of any genuine material (that is, outcome-determinative) factual dispute (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).  For that purpose courts consider evidentiary records in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)).  But to avoid summary judgment a nonmovant "must produce more than a scintilla of evidence to support his position" that a genuine issue of disputed fact exists (Pugh v. City of Attica, 259 F.3d 619, 625 (7th Cir. 2001)) and "must set forth specific facts that demonstrate a genuine issue of triable fact" (id.).  Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

**Background**

Sometime in late 2005, Pomp's submitted an application to

---

[2] This opinion identifies Cobra's and Pomp's respective submissions as "C." and "P.," followed by appropriate designations:  motions as "Mot.--," memoranda as "Mem.--" and LR 56.1 statements as "St. --."  As for the Agreement (supplied as P. St. Ex. 23), its provisions will simply be cited as "Agreement ¶--."

2

Insurelease LLC ("Insurelease"), an equipment finance broker, seeking financing for the purchase of a 2005 model wood grinder (P. St. ¶13). Insurelease approached Cobra on December 1, 2005, asking if it would be interested in providing terms for such a transaction (id. ¶15). Cobra responded that it was familiar with the equipment and agreed to propose terms, which it then did (C. Supp. St. Ex. B). Those terms included a monthly payment of 2.7% of the equipment's purchase price over 48 months (id.). Steve Kochensparger ("Kochensparger"), a part owner and sales director at Insurelease and the individual negotiating with Cobra, testified that to him those terms were consistent with an equipment lease with a $1 purchase option at the end of the lease (P. Supp. St. Ex. 38). Kochensparger and Pomp's believed throughout the negotiations that the terms included such a $1 purchase option (see id.).[3]

After receiving the proposed terms from Cobra, Insurelease presented them to Pomp's and continued to negotiate the deal (see P. St. ¶15). First it arranged with Cobra to reduce the security deposit on the deal from 10% to 5% (C. Supp. St. Ex. B). Later it proposed an alternative term to Cobra: structuring the lease with a 20% residual, which would allow Cobra to take the

---

[3] See Appendix as to the deposition of Kochensparger, which was allowed by this Court to be taken by Cobra after the completion of the scheduled briefing on the current motion. As reflected in the Appendix, that deposition has not altered the conclusion reached in this opinion.

depreciation expense and lower Pomp's monthly payment (id.).[4]
Cobra declined to do so.  Finally, Insurelease asked Cobra if it would provide the same terms for the financing of a less expensive 2001 model wood grinder and stated that, if so, Pomp's would agree to the deal.  Cobra agreed to move forward (P. St. ¶¶16-18).

On January 6, 2006 Pomp's forwarded a check for $3,000 to Cobra, across the face of which was written "Commitment Fee" (id. ¶20).  Pomp's has submitted uncontroverted evidence that it also sent along a signed Insurelease document titled "Conditional Lease Approval" that described the terms of the deal and included the $1 purchase option (id. ¶19).

Cobra, upon receipt of those two items, emailed Insurelease and stated that it would not accept the Insurelease document (C. Supp. St. Ex. A).  Instead, Cobra stated, Pomp's needed to complete and send a Cobra application (id.).  Cobra also clarified that the check sent was an application fee rather than a Commitment fee (id.).  Cobra then sent a copy of the Agreement (P. St. Ex. 18) directly to Pomp's "[i]n order to notify [Pomp's] of Cobra Capital's primary terms and conditions" (C. St. Ex. A).

---

[4] Insurelease's proposal was worded this way:

> [Pomp's] did ask if Cobra Capital would be willing to structure their lease with a 20% residual option.  That would allow Cobra Capital to take the depreciation expense and would lower Pomp's monthly "rental expense."

4

Cobra's cover letter asked Pomp's to sign and complete the Agreement as well as a few ancillary documents (P. St. Ex. 15). It also expressly referred to the $3,000 check as an "application fee" (id.).

Before the Agreement was executed, Pomp's found another grinder, a 2004 model, and again asked Cobra to adjust the terms and conditions of the Agreement accordingly (P. St. ¶¶25-31). Cobra agreed to do so, and Pomp's signed the amended Agreement on February 10, 2006 (id.). Cobra signed on February 13 (id. Ex. 23).[5]

After the Agreement was signed, Pomp's authorized Cobra to remit a check to the grinder's seller (id. ¶37). Pomp's also arranged to pick up the grinder and transport it to its place of business, applied for a title and license plate, extended the warranty coverage on the grinder and applied for a Wisconsin Title identifying Cobra as a secured lender (id. ¶¶39-42). Cobra filed a UCC-1 financing statement in Wisconsin identifying itself as a secured party (id. ¶¶43-46).[6] Pomp's remitted further funds to Cobra for fees incurred in processing the UCC search and

---

[5] Cobra also had Insurelease sign a broker agreement on February 13 (P. Supp. St. Ex. 38). That agreement applied retroactively to the deal with Pomp's and stated that Insurelease had no authority to bind Cobra in any way (id.).

[6] That financing statement noted that it "is filed to give notice of a true lease between the parties named above" (P. St. Ex. 30).

5

titling.  Pomp's was issued a Wisconsin Certificate of Title naming Pomp's as the owner of the grinder and Cobra as the lien holder (id. ¶46).

Pomp's made all payments on the grinder until December 2007 (id. ¶¶47-48).  On June 25, 2008 Cobra sent Pomp's a notice of acceleration and default (id. ¶51).  Cobra then repossessed the grinder and sold it at auction for $113,580 (id. ¶¶57, 67-69).[7]

Cobra's suit requests damages for (1) the remaining payments due under the Agreement as well as (2) the estimated residual value of the grinder, less the proceeds from the sale at auction.  Cobra also requests attorney's fees.

## Claims under the Code

Pomp's motion asks this Court to find that the transaction between itself and Cobra was a "disguised sale"[8] governed by the Code.  There is a rebuttable presumption that any agreement

---

[7] Before the auction Pomp's sent Cobra an email saying that it had found a prospective buyer for the grinder (P. St. ¶61). Pomp's further said that the buyer wanted to inspect the grinder before making an offer (id.).  Cobra told Pomp's that it would entertain an offer subject to inspection only after the prospective buyer demonstrated that it had either cash on hand or financing for the purchase and had also submitted a written offer (id. ¶¶63-64).  If the case goes to trial, it is anticipated that those events will be dealt with in the context of determining the reasonableness of Cobra's conduct under the Code.

[8] This terminology employed by Pomp's counsel is, of course inaccurate--Cobra was never the owner of the grinder, and so it is a fiction to speak of it as having "sold" anything.  More accurately, Pomp's is asking this Court to find that the transaction constituted a financing agreement.  More on this subject in n.12.

6

called a lease is in fact a lease (In re Lunan Family Rests., 194 B.R. 429, 450-51 (Bankr. N.D. Ill. 1996)). Under Illinois law[9] that presumption can be rebutted by a showing that the transaction satisfies one of two tests: the "per se" test or the so-called "economic realities" test (Section 1-201(37)). Because the ensuing analysis reveals that disputed issues of fact exist as to whether the transaction meets either test, Pomp's motion must be denied.

**Per Se Test**

Under the "per se" test, Pomp's must first show that "the consideration [it was] to pay [Cobra] for the right to possession and use of the goods [was] an obligation for the term of the lease not subject to termination by [Pomp's]" (Section 1-201(37)). In addition Pomp's must show that the transaction contains one of the following four elements (Section 1-201(37)(a) to (d)):

>   (a) the original term of the lease is equal to or greater than the remaining economic life of the goods;
>
>   (b) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;
>
>   (c) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement; or

---

   [9] Agreement ¶25 specifies that Illinois law governs this dispute.

7

> (d) the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.[10]

Although Pomp's claims that the transaction meets that per se test because the Agreement had a $1 purchase option, the Agreement itself does not expressly specify such a purchase option.

To be sure, Pomp's has submitted evidence that it <u>intended</u> the transaction to include a $1 purchase option and indeed <u>believed</u> that it did. And there is proof that Insurelease informed Pomp's that a $1 purchase option was part of the deal. But here, as in most cases, the terms of the deal are limited by the four corners of the Agreement, absent any ambiguity (<u>Camico Mut. Ins. Co. v. Citizens Bank</u>, 474 F.3d 989, 992-93 (7th Cir. 2007)). As already stated, the Agreement contains no reference to a purchase option--and if ambiguity exists on that score,[11] in the present Rule 56 context Cobra gets the benefit of reasonable inferences in its favor.

It is also true that the Agreement--a Cobra-drafted form--

---

[10] As will be seen a bit later, Section 1-201(37), part of the "General Definitions" section of the Code, was scarcely a model of good draftsmanship. After the just-quoted provisions the statute turned to an identification of some transaction provisions that did not necessarily create a security interest, and that itemized listing also employed lettered subsections (in that instance (a) through (e)), obviously sowing the seeds of potential confusion in citation references.

[11] More on the subject of ambiguity later.

8

allows for the addition of a purchase option--for instance, it refers to certain alternative courses of action available to Pomp's, including those allowed by "any purchase option" available. Pomp's asserts that those references indicate that the Agreement <u>must</u> include a purchase option. Such an inclusion may perhaps be the conclusion reached when all the facts are in and are weighed by a factfinding jury, but at this stage--again with reasonable inferences drawn in favor of nonmovant Cobra-- that cannot be held as a matter of law.

Pomp's has thus failed to show that there is no disputed issue of fact regarding the existence of a $1 purchase option, nor has it presented evidence that the transaction meets the per se test because it contains any of the other elements listed in Section 1-201(37). On the record before this Court, then, and taking the facts in the light most favorable to Cobra, the transaction is not a secured transaction per se.

**Economic Realities Test**

Pomp's also contends that the transaction constitutes a secured transaction based on the "economic realities of the transaction." Pomp's points to a series of factors set out in <u>Orix Credit Alliance v. Pappas</u>, 946 F.2d 1258, 1261-63 (7th Cir. 1991) that indicate a security transaction rather than a true

9

lease[12] based on those economic realities. But Orix applied an older version of the Uniform Commercial Code, as adopted by New York (the source of the applicable law in that case), which reads differently than the version of the Code that this Court must apply.[13] As n.10 indicates, Section 1-201(37) went on to specify several characteristics that did not in themselves necessarily indicate a security interest:

> (a) the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into;

---

[12] Orix, like other cases in this area of the law, speaks of a "conditional sale" as contrasted with a "true lease" (see, e.g., the internal caption of the opinion at page 1261). This is an odd locution--after all, the equipment lessor there (like Cobra here) never owned the equipment, so to speak of it in "seller" terms is really a fiction. Note that in this instance Pomp's obtained a Certificate of Title naming it (and not Cobra) as the grinder's owner--with Cobra's full knowledge. In real world terms the transaction was unquestionably a financing transaction on Cobra's part, so the dispute boils down to whether its total price for the financing was (1) the sum of the monthly rentals plus $1 or (2) the sum of the monthly rentals plus the reversionary interest in the grinder.

[13] When Orix was decided, the relevant portion of New York's Uniform Commercial Code, which Orix applied, read (N.Y. UCC §1-201(37)(1991)):

> Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

10

> (b) the lessee assumes risk of loss of the goods, or agrees to pay taxes, insurance, filing, recording, or registration fees, or service or maintenance costs with respect to the goods;
>
> (c) the lessee has an option to renew the lease or to become the owner of the goods;
>
> (d) the lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed; or
>
> (e) the lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

Though each of those factors is either present or arguably present in the Agreement, Section 1-207(37) tells us that a transaction does not create a security interest "merely because" it has one or more of those elements.

Overwhelmingly the caselaw and commentary show that, under the version of the Code that governs the Agreement, the most important factor indicating a security agreement is whether the lessee retains an ownership interest in the property at the termination of the lease (see In re Dena Corp., 312 B.R. 162, 169 (Bankr. N.D. Ill. 2004); James J. White & Robert S. Summers, Uniform Commercial Code §30-3.d (6th ed. 2009)). Where it is the lessor that retains the meaningful reversionary interest at the end of the term, "the parties have signed a lease, not a security agreement" (White & Summers, id.).

In its supplement to its motion, Pomp's contends that the Agreement indicates the residual value of the grinder would have

11

remained with it (P. Supp. Mot. 2). Pomp's argues that were Cobra to retain any residual value of the grinder at the termination of the lease, that residual value would necessarily need to have been referred to in the Agreement. Because the Agreement contains no such reference, Pomp's suggests, that residual value necessarily rested with it.

In a normal leasing transaction between a party that is already the owner of property and a prospective lessee, of course there is no occasion to refer to the owner's expected residual interest--it simply comes with the territory. And Pomp's arguments that the different situation here calls for a different analysis cannot, given the oft-here-repeated requirement to draw inferences in Cobra's favor, compel the issuance of a Rule 56 ruling at this stage of the game. Likewise, Pomp's arguments referring to the "any purchase option" language and Cobra's practice of using the Agreement form for both secured transactions and true leases do not suffice to merit summary judgment at this point under that standard.

Under a different standard, however, those factors as well as internal inconsistencies in the Agreement could well lead to a finding of ambiguity. Recall that the Agreement is a Cobra-drafted form--and that it uses it for two different kinds of transactions. That dual purpose is evident in the Agreement's

conflicting provisions regarding residual value.[14]

For instance, Agreement ¶11 ("Risk of Loss") requires the payment of only rents (those past due plus the accelerated and discounted future rents that would have been due under the Agreement) in the event of a loss--no residual value accrued to Cobra. Similarly, Agreement ¶15(f) provides for post-default damages comprising only unpaid rents plus the market value of rents that would have been payable over the remaining term of the Agreement should Cobra choose not to sell or re-lease the equipment--again no residual value would enter into that damages award. Both of those provisions, like the possibility that Pomp's rather than Cobra took the depreciation deduction on the equipment (a right inherent in ownership of the residual interest) with Cobra's full knowledge (see n.4 and the text to which it relates), contrast with other terms of the Agreement that do allocate residual value of the equipment to Cobra upon default or termination.[15]

This Court of course has no way of knowing what led Cobra to

---

[14] It is also apparent in the Agreement's repeated references to "any purchase option"--a phrase that Pomp's points to in support of its position. Of course, under Rule 56 this opinion is bound to interpret that phrase in Cobra's favor.

[15] Because of the operative standard on the current Rule 56 motion, this opinion has not sought to be exhaustive in parsing the detailed provisions of the Agreement to see whether any other portions might provide support for Pomp's position in a factually contested context. That inquiry remains for the future.

generate and employ an attempted one-size-fits-all form of Agreement containing internally inconsistent provisions. If that effort simply reflected a desire to save the costs of developing and maintaining multiple forms, or a desire to make life easier for Cobra's people charged with filling in the blanks in a standard form rather than first having to determine which form to use, that could turn out to be penny-wise and pound-foolish: What may prove instead to be a one-size-fits-none form could well call into play the contra proferentem doctrine and its consequences. But again, as n.15 says, that prospect is for the future.

### **Judicial Estoppel**

Pomp's final argument in favor of finding a financing agreement is that Cobra's position in prior litigation estops it from taking the position it has advanced here. On several occasions Cobra has litigated to enforce firm commitments in connection with the same form of Agreement as that used here. Pomp's suggests that such litigation has the effect of binding Cobra to a commitment to Pomp's for a lease with a $1 purchase option.

But as Cobra notes, those other transactions differed from the transaction involved here. Most importantly, here the Agreement did not expressly grant a $1 purchase option to Pomp's. In the record before this Court, the only document specifying a

$1 purchase option was the "Conditional Lease Approval" prepared by Insurelease.  None of the documents in the record point to Cobra ever proposing or endorsing a $1 purchase option.[16]

Pomp's position is unenviable--Pomprowitz's failure to realize that the Agreement did not specify the $1 purchase option (which he believed Insurelease had negotiated for him) may have bound him to terms and conditions he might otherwise have rejected.  But on the record now before this Court, with the inference this Court is compelled to draw because the matter is now posed in the context of a Rule 56 motion by Pomp's (rather than, for example, a like motion by Cobra that would call for inferences going the other way and could thus also result in that motion's denial), Pomp's effort to obtain a judgment as a matter of law fails.

**Conclusion**

What has gone before resolves Pomp's current motion for partial summary judgment as to liability.  But it is worth reiterating that this transaction is very troubling.  What evidence is in the record suggests that at the very least a critical mistake was made--though by whom, and whether intentionally or not, is uncertain.

---

[16] Kochensparger also believed that the $1 buyout provision was implicit in the Agreement's terms.  But as the foregoing analysis makes clear, that does not suffice to prove Pomp's is right as a matter of law.

It is clear from the record that Pomp's believed the deal included a $1 purchase option--indeed, Kochensparger informed Pomp's that it did. And the economic numbers, which this opinion has not really discussed because of the inference-drawing regimen it has been required to follow, strongly support Pomp's claims that the deal was meant to include a $1 purchase option-- otherwise Cobra would get a major windfall entirely out of sync with its position as a company providing capital for a reasonable yield. If the transaction was really one that contemplated--but mistakenly did not provide--a conventional yield for Cobra's role as a party that provides business financing, it cannot now take advantage of that mutual mistake in its favor.

But that is a subject that may have to be dealt with in the future under different standards than those employed here. For now it is enough to say that Pomp's motion for partial summary judgment is denied. This action is set for a next status hearing at 9 a.m. March 1, 2010.

_____
Milton I. Shadur
Senior United States District Judge

Date: February 23, 2010

Appendix

Because Cobra had scheduled but had not yet conducted Kochensparger's deposition within the time frame set for briefing Pomp's Rule 56 motion, its counsel belatedly requested and this Court granted leave to file a final supplemental response following completion of the previously established briefing schedule on the motion. That filing was further delayed a bit to allow Cobra's counsel to review the deposition transcript, and it was delivered to this Court's chambers on February 22.

Cobra's Supplemental Response dealing with the Kochensparger deposition begins in material part with a discussion of various matters relevant to his credibility as a witness. It follows that with a substantive attack on Kochensparger's understanding of the equipment lease as a financing arrangement (a somewhat different animal, as this Court's opinion reflects, from an equipment lease entered into by the manufacturer or owner of the equipment). But the bottom line for purposes of this opinion is found in paragraph 8 of the Supplemental Response, which reads (footnote and citation omitted):

> The issue of whether the residual value of the equipment was to remain with Defendants or Cobra is then, at most, a disputed question of material fact. Any other conclusion would require this court to weigh the testimony of Mr. Kochensparger against the assertions of Cobra.

That evaluation conforms to this Court's view. Accordingly it has occasioned no change in the conclusion this Court had already reached on the merits of the motion.